IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-00441-01-CR-W-GAF |
| | ) | |
| VERNA CHERYL WOMACK, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant Verna Cheryl Womack's Motion to

Suppress Illegally Searched and Seized Electronic Evidence (doc #67). For the reasons set forth

below, it is recommended that the motion be denied.

I. BACKGROUND

On December 12, 2013, the Grand Jury returned a ten count indictment against Verna

Cheryl Womack. Count One charges that beginning in 1996 and continuing to the date of the

indictment, defendant corruptly endeavored to obstruct and impede the due administration of the

internal revenue laws of the United States in violation of 26 U.S.C. § 7212(a). Counts Two

through Ten charge that on May 19, 2009, defendant, in a matter within the jurisdiction of the

executive branch of the Government of the United States, that is, the United States Department of

the Treasury and the United States Department of Justice, voluntarily and intentionally made false

and fraudulent statements of material fact, while knowing those statements to be false and

fraudulent at the time she made them, in violation of 18 U.S.C. § 1001(a)(2).

An evidentiary hearing on defendant's pretrial motions was held on June 2 through 4, June 17 and 18, and July 22 through 24, 2015. Defendant Womack was represented by retained counsel Lyndsey Conrad and Jeffrey B. Jensen. The Government was represented by Assistant United States Attorneys Brian P. Casey and Daniel M. Nelson. Witnesses pertinent to the pending motion to suppress testified on June 2, 3, 17, 18 and July 22, 2015, and included Allyson Baker, formerly a Department of Justice ("DOJ") Civil Tax Division attorney; Daniel Applegate, a DOJ Civil Tax Division attorney; Revenue Service Representative Raul Pertierra; J.D. Carroll, program manager for the exchange of information in the Office of the Assistant Deputy Commissioner International for the IRS; FBI Special Agent Bryan Witt; IRS Special Agent Adam Jobes; Kindra Mynatt; and Brandy Burch.[1]

## II.  FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1.  Allyson Baker worked at the DOJ Civil Tax Division from October 1, 2007 to 2011. (Tr. at I-8, I-10) While at the DOJ Civil Tax Division, Ms. Baker worked mostly on injunction cases that concerned enjoining promoters of fraudulent tax shelters. (Tr. at I-9) Ms. Baker was assigned to be the lead attorney on the Allen Davison case. (Tr. at I-10) Davison had worked at Grant Thornton, an accounting firm in Kansas City. (Tr. at I-13, I-25) The goal at the outset was to stop Davison from promoting tax schemes. (Tr. at I-12)

2.  Daniel Applegate began working at the DOJ Civil Tax Division on September 17, 2007. (Tr. at I-134) At some point, Mr. Applegate was assigned to help Allyson Baker in the Allen Davison case. (Tr. at I-15, I-137) Mr. Applegate testified that Davison was a promoter of fraud schemes. (Tr. at I-138) Mr. Applegate described the allegations against Davison as follows: "Basically that he was advising his clients to set up corporations to shift money. And these corporations were really sham entities. They didn't have any actual business purpose. It was just a paper entity." (Tr. at I-138) Davison used consulting agreements between the entities as a way to move money back and forth. (Tr. at I-138 to I-139) The

---

[1] Brandy Burch was formerly known as Brandy Wheeler.

2

companies involved in the Davison case were domestic. (Tr. at I-142) Mr. Applegate testified that it would have been interesting to him if he found out that any of Davison's clients conducted business through shell corporations or nominal corporations located offshore. (Tr. at I-143)

3. Ms. Baker testified that Allen Davison was engaged in the promotion of two main categories of fraudulent tax shelters. (Tr. at I-13 to I-14) One involved the use of bogus so-called management companies or shell companies in tandem with Roth IRAs to evade the payment of income taxes for high net worth individuals. (Tr. at I-13, I-86) The other involved fraudulent chicken farm deductions. (Tr. at I-13) The complaint to enjoin Davison was filed on February 21, 2008. (Tr. at I-14)

4. After leaving Grant Thornton, Allen Davison became an in-house tax consultant and advisor for V. Cheryl Womack, who was then the owner of the National Association of Independent Truckers. (Tr. at I-25) In 2002, when Womack sold the National Association of Independent Truckers, Davison continued to work for Womack at her holding company, VCW Holding Company, LLC ("VCW Holding") where, at the time of the filing of the complaint to enjoin Davison, he was employed as an investment advisor. (Tr. at I-25)

5. Special Agent Witt had been assigned to an embezzlement case involving Brandy Wheeler in March 2008. (Tr. at II-180 to II-181) Wheeler worked at VCW Holding until December 14, 2007. (Tr. at II-195) Wheeler was accused of stealing money from her employer, Cheryl Womack. (Tr. at II-181) Special Agent Witt first met with Womack on March 12, 2008. (Tr. at II-183; Government's Ex. 101) At this first meeting, Special Agent Witt was advised that Wheeler had threatened to report on Womack if Wheeler was reported to the authorities. (Tr. at II-184) Special Agent Witt was not familiar with what was meant by that statement and continued to work the case as an embezzlement case. (Tr. at II-184) Special Agent Witt asked Womack to provide him documents to help with the embezzlement case. (Tr. at II-184) One of the documents Womack provided was a Master List - Accounts. (Tr. at II-185; Government's Ex. 135) Another document provided by Womack contained e-mail correspondence in February and March 2008 between Womack and the Bank of Butterfield in the Cayman Islands. (Tr. at II-187; Government's Ex. 104) This e-mail correspondence references accounts for Lucy Limited, Future Strategies, Eleventh Tr. and Twelfth Tr. (Tr. at II-188; Government's Ex. 104) The e-mail correspondence also mentions having funds in DAR. (Tr. at II-188; Government's Ex. 104) In order to figure out how to prove up the embezzlement, Special Agent Witt had a number of questions for Womack concerning Wheeler's employment and companies with which there might have been unauthorized transactions, including the Bank of Butterfield. (Tr. at II-193 to II-194; Government's Ex. 110) Throughout the summer, Special Agent Witt and Womack e-mailed back and forth regarding Wheeler. (Tr. at IV-8 to IV-9) Special Agent Witt attempted to

interview Wheeler in early May 2008. (Tr. at II-196) This interview was postponed as Wheeler's attorney negotiated a plea to an information for her and Special Agent Witt was not to speak with Wheeler until after she entered the guilty plea. (Tr. at II-196)

6.  In June 2008, Dan Applegate was contacted by John Osgood, a criminal defense attorney in Kansas City, Missouri, offering to proffer his client, Brandy Wheeler, in the Davison case. (Tr. at I-56, I-145) Mr. Osgood said his client worked with Allen Davison and had information that would be relevant to the Davison case. (Tr. at I-145 to I-146) Mr. Applegate testified that this was the first time that he had heard the name Brandy Wheeler. (Tr. at I-146) Mr. Applegate set up a meeting with Mr. Osgood and Wheeler. (Tr. at I-146) Shortly thereafter, on June 27, 2008, Mr. Applegate received a phone call from Gene Porter of the United States Attorney's Office in Kansas City, Missouri. (Tr. at I-146; Government's Ex. 4) This was Mr. Applegate's first ever contact with anyone from this United States Attorney's Office. (Tr. at I-146) Mr. Porter was not happy; he seemed to believe that Mr. Osgood was trying to go around the United States Attorney's Office to try and set up some sort of leniency agreement between Wheeler and the DOJ. (Tr. at I-146) Mr. Porter said that Wheeler had not pled guilty yet and that they would like for Mr. Applegate not to talk to her until after the guilty plea. (Tr. at I-147) Mr. Applegate was told that "any interview with Ms. Wheeler before she has accepted criminal responsibility for her actions may hinder our prosecution of her." (Tr. at I-147; Government's Ex. 4) Also, Mr. Porter asked that Mr. Applegate not talk with Wheeler without first coordinating with the United States Attorney's Office. (Tr. at I-147)

7.  Special Agent Witt first met with Brandy Wheeler on August 7, 2008, immediately after her guilty plea to embezzling over $1.1 million from VCW Holding. (Tr. at II-196 to II-197) At that August 7, 2008 interview, Wheeler alleged that Cheryl Womack had engaged in a long-term tax evasion fraud or corporate fraud since maybe 2002, involving the Cayman Islands. (Tr. at II-198) Wheeler mentioned the Bank of Butterfield, JoJoDi, and companies called DAR and Lucy. (Tr. at II-198 to II-199) Wheeler also mentioned electronic files that she took before she left VCW Holding. (Tr. at II-199) Wheeler tendered her resignation on November 6 or 7, 2007, and her last day of work was December 14, 2007. (Tr. at VI-63) Wheeler's title at VCW Holding was controller. (Tr. at VI-62) Wheeler described her duties as follows:

> The duties were anything and everything related to Cheryl Womack's personal finances, all of the businesses that she would invest in, any of the companies that she had sold that were rolling off, a claims business. Entailed working with the Cayman Islands companies. It entailed handling personal investments, all banking, anything pretty much that would fall underneath a financial umbrella.

4

(Tr. at VI-62) Wheeler testified that she had full access to the office; she had a key to the building and security codes for the alarm up until her last day of work.[2] (Tr. at VI-67) It was Special Agent Witt's understanding that Wheeler had full access to the records she took as part of her work duties and that she did not have to hack into the system; the files that she copied were on her own desktop and that she only logged in as herself and they included her e-mails and files with which she was familiar.[3] (Tr. at II-199 to II-200) Wheeler testified that in addition to her own e-mails, she had access through her work computer to the network which contained an F drive and an S drive. (Tr. at VI-85) The F stood for financial and the S stood for shared. (Tr. at VI-85) Wheeler accessed the F and S drives as part of her work duties. (Tr. at VI-85) Wheeler testified that she had full control over files on the F and S drives. (Tr. at VI-86) Wheeler testified that the majority of the documents in the F and S drives were created by her and even for those documents that she did not create, she knew what the majority were because at some point, she would have had involvement with them. (Tr. at VI-162) There were, however, some documents in the F and S drives with which Wheeler was not familiar. (Tr. at VI-163) Wheeler's access to and control over the F and S drives did not change after she tendered her resignation, but before she stopped working for VCW Holding.[4] (Tr. at VI-87) Wheeler testified that most of VCW Holding's business was done via e-mail. (Tr. at VI-73) Wheeler did not have access to any other employee's e-mails. (Tr. at VI-85) Wheeler's control over her VCW Holding e-mail account did not change after she tendered her resignation, but before she stopped working at VCW Holding. (Tr. at VI-73 to VI-74) Wheeler was expected to continue work as usual during this time and was given additional projects to get done before her last day. (Tr. at VI-74) One project given to Wheeler after she tendered her resignation was to do a report on any activities with the Caymans and money in the Caymans and then to destroy the report after presenting it to Womack so that only Womack would have a copy. (Tr. at VI-79 to VI-80) Wheeler was still doing work with Cayman Island entities up to her last day of work. (Tr. at VI-82) Wheeler advised that she copied her records before she left because she feared being a scapegoat for Cayman-related items and for leverage because she knew she would be in trouble for the embezzlement. (Tr. at

---

[2]On cross-examination, Wheeler admitted that she may be mistaken in that there is an e-mail from Kindra Mynatt to Womack that Wheeler brought in her laptop and office key on December 6, 2007. (Tr. at VI-145 to VI-146)

[3]Although Wheeler testified in a deposition that she "didn't look at [the information she took]. I could care less about those files," (Defendant's Ex. 38A), Special Agent Witt testified that Wheeler admitted to him that she was frustrated when she made this statement. (Tr. at IV-47) It was Special Agent Witt's understanding that Wheeler "had full access to all those files and was familiar with everything she provided to us." (Tr. at IV-47)

[4]On cross-examination, Wheeler testified that if she turned in her company laptop on December 6, 2007, as set forth in an e-mail from Kindra Mynatt to Womack, she would not have had remote access to the F and S drives after December 6, 2007. (Tr. at IV-145 to VI-147)

II-199, VI-88)  Wheeler felt that her e-mails would provide proof of Womack directing her to do things.  (Tr. at VI-89)  Wheeler was unsuccessful in copying the files herself so she had her brother help her copy the files.  (Tr. at II-199, VI-89 to VI-90)  Wheeler's brother, Brandon Burch, came to the office during business hours on November 21, 2007, and he copied her e-mail account onto a disk.  (Tr. at VI-90 to VI-91)  Wheeler did not have her brother copy any files that she did not have access to from her own work computer.  (Tr. at VI-92)  Wheeler did not have Womack's permission or authorization to copy the records.  (Tr. at IV-37 to IV-38, VI-92)  Special Agent Witt asked Wheeler to get those records to him as soon as possible.  (Tr. at II-200)  Special Agent Witt testified that Womack became a potential target after Wheeler made the allegations against Womack on August 7, 2008.  (Tr. at IV-35)

8.  Special Agent Witt and IRS Special Agent Adam Jobes met with Brandy Wheeler on August 13, 2008.  (Tr. at II-200)  This was Special Agent Jobes' first meeting with Wheeler.  (Tr. at IV-124)  Special Agent Jobes was present because some of Wheeler's allegations related to tax allegations.  (Tr. at II-200)  Wheeler continued to provide information about Cheryl Womack and Cayman Island entities.  (Tr. at II-201)  Wheeler again mentioned companies called JoJoDi, DAR and Lucy.  (Tr. at II-201)  Wheeler stated that Lucy was a nominee used to own wine that Womack sold at Sotheby's.  (Tr. at II-201)  Wheeler mentioned individuals named Steven Gray and Duckworth, the Bank of Butterfield and the Tenth Trust, the Eleventh Trust, the Twelfth Trust, Emerald Trust, Star Trust and DAR Holdings.  (Tr. at II-202, II-205)  Wheeler provided details about these entities that are set out in a Memorandum of Interview (Government's Ex. 115).  (Tr. at II-200 to II-202)  Wheeler stated that Womack purchased a condo in the Cayman Islands in 2002 using the company DAR Holdings and then said she was a resident of the Cayman Islands for income tax purposes even though she never spent more than a week there in any year.  (Tr. at II-205)  Wheeler said that in June 2007, Womack leased the condo full-time.  (Tr. at II-205)  Wheeler also provided information about domestic activities of Womack and Allen Davison.  (Tr. at II-204)  The agents were told all this information before they were handed any electronic media by Wheeler.  (Tr. at II-202)  Wheeler advised the agents that the four disks she brought were copies.  (Tr. at II-206 to II-207; Government's Ex. 115)  Special Agent Witt told Wheeler that he needed all the originals that she had for evidentiary and forensic purposes.  (Tr. at II-206)  Special Agent Witt never looked at those four disks.  (Tr. at II-207)

9.  The next day, August 14, 2008, Brandy Wheeler brought Special Agent Witt 21 computer disks that were purportedly the originals, as well as an envelope containing various documents written by Wheeler with her attorneys in February 2008 setting out allegations against Womack and also some notes on index cards.  (Tr. at II-208; Government's Ex. 117)  Special Agent Witt testified that the Cierpiot memo, which was written by Wheeler with her attorneys, contained an

outline of Wheeler's allegations. (Tr. at IV-69) The note cards listed people and entities involved with Womack. (Tr. at II-212) On one of the note cards was: "Butterfield Bank, Katherine Myles, trustee of all non-reinsurance entities in Cayman. Statements for Cheryl and Dean, personal accounts kept at bank." (Tr. at II-213) On another note card: "Willis Corroon Management Limited – Cayman, Steven Gray, Director of Reinsurance, James Owen, Secretary of Reinsurance Entities, Ryan Ogden, Accountant for Cayman entity." (Tr. at II-213) The people listed on the note cards became interview subjects in the investigation. (Tr. at II-213) It was Special Agent Witt's understanding that the 21 disks were all files related to e-mails, as well as some shared files, to which Wheeler had full access and authority and which would corroborate her allegations.[5] (Tr. at II-208, IV-48) Wheeler signed a consent to search the disks. (Tr. at II-213 to II-214; Government's Ex. 120) The disks were sent to the Regional Crime Forensics Lab. (Tr. at II-214) The Regional Crime Forensics Lab used a software program called Case Agent Investigative Review ("CAIR") to allow the agents to view the files without modifying the original disks. (Tr. at II-216) Special Agent Witt testified that he and Special Agent Jobes had extreme difficulty navigating the software. (Tr. at II-217) Special Agent Witt testified that he spent just a couple of hours trying to view the files, before giving up on the software. (Tr. at II-217 to II-218) Special Agent Witt testified that his and Special Agent Jobes' review of the electronic media using the CAIR software resulted in the identification of only three documents, one of which was a picture of Allen Davison. (Tr. at II-219) The other two documents did not play any role in Special Agent Witt's investigation; no information off those documents was used for investigative leads. (Tr. at II-219 to II-220) Special Agent Witt testified that he got no evidence for his case from his review using the CAIR software. (Tr. at II-220) Special Agent Jobes testified that likewise, he recovered no evidence from using the CAIR software. (Tr. at IV-167 to IV-168) Special Agent Jobes testified that after his attempts to use CAIR, he never personally reviewed any of the original electronic media from Wheeler. (Tr. at IV-168) In November 2009, Wheeler provided Special Agent Witt with some e-mails from a copy of the disks that she had kept. (Tr. at II-224) Wheeler testified that the e-mails that she forwarded to Special Agent Witt were ones that she recalled from memory. (Tr. at VI-106) Special Agent Witt testified that he was never able to open the file from which these e-mails came. (Tr. at II-224) Later, in 2010, Special Agent Witt requested that selected disks be copied, so that he could review the files in an easier manner. (Tr. at II-222) Special Agent Witt testified that the only disk he was able to review and from which evidence in the case came was Disk 26 and his review of Disk 26 took place after March 2010. (Tr. at II-223) Disk 26 contained files from the shared F

---

[5]As it turned out, some of the disks were found by Wheeler in a pile of junk in a closet at her home. (Tr. at VI-98) Wheeler believed that these old disks had accumulated in her closet as she had cleaned out her briefcase to go on trips. (Tr. at VI-98) Wheeler was familiar with the information on these disks as she had used them in her work at VCW Holding. (Tr. at VI-98 to VI-99)

and S drives that Wheeler copied on her last day of work. (Tr. at II-224) Kindra Mynatt, a former employee of VCW, testified that there were no restrictions to access on the shared F and S drives. (Tr. at VI-15)

10.     Special Agent Witt obtained a laptop owned by Womack from Wheeler. (Tr. at IV-74) Special Agent Witt did not search the laptop until years later in preparation for the motions in this action. (Tr. at IV-74) Wheeler had found the laptop in her travel bag. (Tr. at IV-108) The laptop had been used by people associated with CARD Aeronautics. (Tr. at IV-108) Wheeler testified that she never logged onto the laptop or accessed that information. (Tr. at VI-103)

11.     Brian Casey from the United States Attorney's Office advised Mr. Applegate when Brandy Wheeler entered a guilty plea and told Applegate that he could then talk to her. (Tr. at I-148 to I-149) Mr. Casey also told Mr. Applegate that he wanted to keep track of everyone that Wheeler met with. (Tr. at I-149) In October 2008, Mr. Applegate e-mailed Mr. Casey to set up a meeting with Wheeler. (Tr. at I-150) On November 12, 2008, Mr. Applegate met Mr. Casey and Ms. Wheeler for the first time. (Tr. at I-150) FBI Special Agent Bryan Witt also sat in on the interview. (Tr. at IV-75) Special Agent Witt testified that he wanted to make sure that Wheeler was telling everyone the same story, no matter what venue. (Tr. at IV-76) Immediately prior to the interview, Special Agent Witt told Mr. Applegate that he had some documents that Brandy Wheeler had provided. (Tr. at I-203 to I-204) Mr. Applegate took 14 pages of notes at his November 12 meeting with Wheeler. (Tr. at I-152; Government's Ex. 36) Ms. Wheeler stated that she worked for Cheryl Womack and that she worked with Allen Davison; he was someone she would go to for tax advice. (Tr. at I-152) Wheeler mentioned JoJoDi, a Caymans entity; VCW, Inc.; DAR Holdings, a Cayman company; and Lucy Limited. (Tr. at I-153) Wheeler alleged that Lucy Limited and DAR Holdings received a $2,500 consulting fee per month from VCW and that VCW, Inc. had consulting agreements with other entities. (Tr. at I-153; Government's Ex. 36) Wheeler stated that DAR Holdings had a registered agent in the Caymans. (Tr. at I-153 to I-154) Wheeler alleged that Cheryl Womack controlled 50 entities, 45 of which were just paper entities. (Tr. at I-154) Mr. Applegate testified that this rang a bell with the Davison investigation as paper entities was one of the schemes alleged against Davison. (Tr. at I-154) Wheeler said that JoJoDi was owned by a trust and that the trust was owned by a non-profit owned by Womack. (Tr. at I-154) Wheeler said that she, Allen Davison and Steven Gray were on the board of directors for JoJoDi. (Tr. at I-154 to I-155) Wheeler said the directors were paid $25,000 per year and that she had set up a bank account for herself in the Caymans to receive this money. (Tr. at I-160) Wheeler said that Allen Davison set up some of the Cayman entities. (Tr. at I-155) Wheeler said that Davison was also involved with VCW Accounting. (Tr. at I-155) Wheeler talked about Womack using Roth IRAs. (Tr. at I-155) Mr. Applegate testified that this was another thing that Allen Davison's clients were known to have done. (Tr. at I-155

to I-156)  Wheeler said that Womack would run personal income through entities. (Tr. at I-156)  Wheeler provided information about chicken farms and said that this was connected to VCW, Inc.  (Tr. at I-157)  Mr. Applegate testified that schemes related to egg producing and agricultural subsidies was something else for which Allen Davison was investigated.  (Tr. at I-157 to I-158)  Wheeler said that she, Womack, Womack's husband and Davison all have accounts in the Caymans, that they never reported these accounts or income from these accounts on their tax returns and that they never claimed the companies on tax returns either.  (Tr. at I-160)  Wheeler listed the banks that were used in the Caymans as the Bank of Butterfield, which invested in the stock market for VCW and Womack, and the Bank of Caledonia for "Future Strategies."  (Tr. at I-160)  Wheeler said that JoJoDi owned a condominium in the Trump Tower in New York.  (Tr. at I-160 to I-161)  Wheeler told Mr. Applegate that Davison would tell his clients that if they were challenged by the IRS to look at it as if they were getting a loan from the IRS and would just have to pay it back if they lost in audit.  (Tr. at I-161)  VCW, Inc. was Wheeler's former employer, where she worked with Cheryl Womack and Allen Davison.  (Tr. at I-157)

12. On December 2 and 4, 2008, Special Agent Witt spoke again with Brandy Wheeler to get more information.  (Tr. at IV-17)  These verbal debriefs, along with paper documents that Wheeler had provided, formed the basis for questions that Special Agent Witt wanted to ask Cheryl Womack.  (Tr. at IV-18)

13. Special Agent Witt and Special Agent Asher met with Cheryl Womack at her office on December 15, 2008.  (Tr. at IV-18 to IV-19, IV-148)  Special Agent Witt showed Womack the affirmative defenses and counter-allegations that Brandy Wheeler had filed in Womack's civil action against her and went through those point by point.  (Tr. at IV-19 to IV-20, IV-23; Government's Ex. 117)  These affirmative defenses and counter-allegations included:

39. Plaintiff is barred from obtaining any equitable relief because plaintiff and its alter ego, V. Cheryl Womack, have committed tax evasion on a massive scale, and therefore have unclean hands in the following respects, provided by way of example and not by way of limitation:

    a. V. Cheryl Womack paid no federal or state personal income taxes on the sale of her insurance business VCW, Inc. for over $32 million in April 2002 (in fact, V. Cheryl Womack's 2002 federal income tax return claimed $168,000 in *losses*);

    b. V. Cheryl Womack paid no federal or state personal income taxes on $5.8 million of earnouts received in April 2003 from the sale of VCW, Inc. (in fact, V. Cheryl Womack's 2003 federal income tax return claimed $6,380,752 in *losses*);

9

c. By maintaining a basket of approximately 50 companies with VCW Holding Company LLC which are all wholly owned by V. Cheryl Womack, and only a small percentage of these are legitimate "venture capital" type holdings. The true purpose of these companies is twofold, with both purposes having a tax-evasion ambition: (i) to accumulate bogus "losses" to use to sop up whatever income there might be realized by plaintiff, in order to avoid income taxes, and (ii) to be able to create intra-company balance sheet activity, to obscure the source of funds and to hide revenues to avoid income taxes;

d. by hiding funds from the sale of the insurance companies in a basket of Cayman Islands companies.

e. by creating fraudulent inter-company balance sheet activity among the companies to generate bogus losses and expenses to sop up all income (for example, carrying forward millions of dollars in Net Operating Losses for years and years);

f. by utilizing fraudulent indemnity contracts between the Cayman Island companies and the U.S. based companies in order to create false "premiums" for the US companies to pay out and use to sop up income, and then to generate false "losses" which the Cayman-based companies then indemnified in order to move money from Cayman to the U.S. tax-free;

g. by utilizing fraudulent loan contracts between the Cayman Island companies and the U.S. based companies in order to fraudulently "borrow" money to move money from Cayman to the U.S., even though the loans are not repaid, to evade taxes;

h. by fraudulently claiming on her tax returns a Cayman Island residence at "The Sovereign" even though in fact she resides in Johnson County, KS and only uses The Sovereign as a vacation home and, in fact, the condominium is actually possessed by a tenant;

i. by personally enjoying the use of a vast wine collection stored in a custom cellar within her Johnson County, KS home, even though ostensibly the collection was owned by Lucy Ltd., a Cayman Islands company, and selling the wine at a Spring 2008 auction through Sotheby's, wherein the collection was blatantly represented to be the personal collection of V. Cheryl Womack; and

j. by purchasing losses of a target company to be able to claim the losses to

absorb income to avoid tax.

(Government's Ex. 117)   Special Agent Witt asked Womack about the Cayman entities that Wheeler had talked about.   (Tr. at IV-23)   Special Agent Witt asked Womack about the master list of accounts that Womack had provided to Witt in March.   (Tr. at IV-23)   Special Agent Witt's questions were formed from his verbal debriefs with Wheeler and the paper documents that Wheeler had provided.   (Tr. at IV-21)   The electronic evidence provided by Wheeler did not form the basis for any questions.   (Tr. at IV-21)

14.   At the time of his November 12, 2008 interview of Brandy Wheeler, Mr. Applegate had not yet received any documents related to Wheeler; all of the information was provided orally from Wheeler.   (Tr. at I-156)   Shortly after this interview, Mr. Applegate requested documents from Special Agent Witt.   (Tr. at I-157, I-162)   Mr. Applegate sent Special Agent Witt a letter requesting any documents that he had in his possession from Brandy Wheeler that may be relevant to the civil injunction suit against Allen Davison.   (Tr. at I-162, I-203 to I-204; Government's Ex. 8)   Sometime between December 8, 2008 and January 14, 2009, Mr. Applegate received electronic records from Special Agent Witt.   (Tr. at I-93, I-96, I-162)   Mr. Applegate testified that he did not look at the documents right away and when he did they were difficult to read.   (Tr. at I-163)   Mr. Applegate testified that these records played no role whatsoever in the decision to issue a subpoena to Cheryl Womack.   (Tr. at I-164)

15.   A video deposition of Brandy Wheeler was set up in the Davison case for March 11, 2009.   (Tr. at I-106, I-165 to I-166)   Mr. Applegate was concerned that Ms. Wheeler might be in jail and unavailable at the time they would need her testimony in the Davison trial.   (Tr. at I-164 to I-165)   Mr. Applegate talked to Brian Casey prior to the Wheeler deposition because he wanted to make sure that he was not doing anything to obstruct the case against Wheeler.   (Tr. at I-166)   Mr. Casey never gave Mr. Applegate any questions to ask Wheeler.   (Tr. at I-166 to I-167)   Mr. Applegate did not know at that time that there was a criminal case against Cheryl Womack.   (Tr. at I-167)   All he knew was that Mr. Casey had a criminal case against Brandy Wheeler.   (Tr. at I-167)   Mr. Applegate provided the Wheeler deposition transcript to Mr. Casey so that he could confirm that Wheeler was cooperating and telling the truth.   (Tr. at I-167 to I-168)

16.   On March 24, 2009, Brandy Wheeler met with an attorney from the IRS named David Flassing.   (Tr. at VI-193)   Mr. Flassing was with the Office of Chief Counsel, IRS, in the Large and Mid-Size Business Division, based out of Chicago, Illinois.   (Tr. at VI-203)   Mr. Flassing was representing the IRS in a lawsuit in United States Tax Court, captioned CARD Aeronautics, LLC v. Commissioner. (Tr. at VI-202; Defendant's Ex. 90)   The case pertained to the 2003 tax year of CARD Aeronautics, LLC, ("CARD") when Wheeler had kept the books for CARD

as controller.  (Defendant's Ex. 90)  The name "CARD" was derived from the first names of the members of Cheryl Womack's immediate family.  (Defendant's Ex. 90)  Wheeler testified that she told Mr. Flassing that she was assisting in an investigation of Womack by Special Agent Jobes and Special Agent Witt.  (Tr. at VI-203 to VI-204)  Special Agent Witt testified that he provided Mr. Flassing with the electronic records copied by Wheeler.  (Tr. at IV-58)

17.     Ms. Baker made the decision to subpoena Cheryl Womack for a deposition in the Allen Davison injunction case.  (Tr. at I-45)  The deposition subpoena also asked Womack to produce fifteen categories of documents spanning ten years.  (Tr. at I-206)  Ms. Baker sought to depose Womack because Womack was disclosed in Davison's initial disclosures and interrogatory responses and because Womack had offered a public statement to The Kansas City Star.  (Tr. at I-45)  Mr. Applegate testified that the deposition of Womack was important because they wanted to know what Davison had been doing since he left Grant Thornton in 2002 under mysterious circumstances.  (Tr. at I-144)  The subpoena to Womack was dated January 6, 2009.  (Tr. at I-45; Government's Ex. 10)  The process servers encountered a good deal of difficulty in serving Womack.  (Tr. at I-47)  Womack was personally served on January 25, 2009.  (Tr. at I-46)  Ms. Baker testified that it was then difficult to schedule Womack's deposition.  (Tr. at I-47)  Ms. Baker initially intended to take Womack's deposition herself.  (Tr. at I-47)  Ms. Baker ended up delegating Womack's deposition to Dan Applegate.  (Tr. at I-57, I-168)

18.     Cheryl Womack was deposed at her attorney's office in Kansas City, Missouri, on May 19, 2009.  (Tr. at I-54, I-184)  Mr. Applegate testified that he asked Womack about JoJoDi at her deposition.  (Tr. at I-184)  Womack said she did not know much about it, that a group of investors owned it, and that Allen Davison was not involved with setting it up.  (Tr. at I-184)  Mr. Applegate testified that he asked Womack about DAR Holdings and Lucy Limited and that he got similar responses from Womack.  (Tr. at I-185)  Based on Womack's answers, it appeared that she did not know much about these entities, but based on what he had heard from Brandy Wheeler, Mr. Applegate did not believe Womack.  (Tr. at I-185)  Mr. Applegate testified that if Womack had testified that Davison was involved in setting these things up, that he advised her to do these things or that he said what the benefits would be for her taxes, that information would all be relevant and material to the case against Davison.  (Tr. at I-184, I-185)

19.     Mr. Applegate testified that he marked some of the documents he received from Special Agent Witt as exhibits in Cheryl Womack's deposition.  (Tr. at I-218)  Specifically, Mr. Applegate marked five exhibits (#701, #702, #703, #706 and #707) that he obtained from Special Agent Witt.  (Tr. at I-220)  Two (#701 – accounting services agreement with Steve Miller and #702 – accounting services agreement with Thomas Lauerman) were contracts between VCW Accounting and customers.  (Tr. at I-219 to I-220; Government's Ex. 40 at 3)  At her deposition,

Womack testified that Brandy Wheeler would have prepared contracts between VCW Accounting and potential clients and that Brandy Wheeler would have been in charge of contracting with the clients. (Government's Ex. 40 at 134-35) Exhibit #703 was an unsigned draft of a nondisclosure/noncompetition agreement between VCW Holding and Allen Davison. (Government's Ex. 40 at 3, 136-37) Womack testified that Brandy Wheeler would have been responsible for putting the appropriate names and dates in the nondisclosure/noncompetition agreements. (Government's Ex. 40 at 136) Exhibit #706 was titled "Cheryl Womack, personal information for tax calculation." (Government's Ex. 40 at 143) Womack testified that she was unfamiliar with the document. (Government's Ex. 40 at 144) Document #707 was a memo from Allen Davison to Womack regarding a fundraising opportunity for Women's Life Center or Truckers Helping Truckers which Womack said she thought was crazy and did not do. (Government's Ex. 40 at 3, 145-147) All of these exhibits were marked and discussed after Mr. Applegate had already asked Womack about entities like JoJoDi. (Tr. at I-240) Mr. Applegate further testified that these five exhibits also would have been responsive to the deposition subpoena to Womack. (Tr. at I-220)

20.     Mr. Applegate testified that DOJ Tax later issued a document subpoena to VCW Accounting. (Tr. at I-172) The subpoena was for the Allen Davison injunction case. (Tr. at I-172) Davison worked at VCW Accounting and he advised their clients and helped them set up tax plans. (Tr. at I-172)

21.     Special Agent Jobes testified that an official criminal investigation of Cheryl Womack by the IRS began in April 2009. (Tr. at IV-117) Special Agent Jobes became involved with Womack in late 2008, when he became aware of an ongoing investigation that he later joined. (Tr. at IV-117) Special Agent Jobes was initially contacted by John Osgood, a criminal defense attorney in Kansas City, Missouri, who said he had a client, Brandy Wheeler, who had information to share with IRS Criminal Investigations. (Tr. at IV-117 to IV-118) In September 2010, Special Agent Jobes requested assistance from IRS Exchange of Information in obtaining information from businesses and financial institutions in the Cayman Islands. (Tr. at II-29 to II-30) The September 7, 2010 memo to Raul Pertierra, Acting Revenue Service Representative (International), provided the following information regarding the examination or investigation, in part:

> The investigation to date indicates that WOMACK has been involved in a number of schemes, including the evasion of her 2004-2009 personal income tax liabilities.
>
> Information developed during the course of the investigation indicate[s] that WOMACK is using companies/entities and trusts that are based in the Cayman Islands and have bank accounts at the Bank of Butterfield, located in the Cayman Islands.

13

Information obtained from email records[6] and a reliable source state that WOMACK has signature authority and/or control of these bank accounts and that she ultimately controls the flow of at least some of the money in and out of these accounts. WOMACK has created loan documents to enable Cayman entities she controls to "loan" funds back for her use in the United States.

(Government's Ex. 44)  Special Agent Jobes provided additional information to support his requests, including the following e-mails obtained from Wheeler:

[James Owen at Willis Management (Cayman), Ltd.] stated the following in an email dated 11/05/2007: "… Bank of Butterfield are the Trustee for each of the Trusts and also prepare their accounts.  From a Cayman operational perspective Bank of Butterfield act as the Trust Manager (in the same way as we act as the Insurance Manager for JoJoDi) and can advise on all aspects of the Trusts.   We can not get involved in the Trust work.  As previously discussed our Insurance Manager's License does not permit us to carry out any work with respect to "non captive" entities such as Trust work.   It is for this reason that we can not be involved in the execution of the said agreements.   As the Insurance Manager we will be happy to coordinate the payment of a dividend from JoJoDi if that is the preferred course of action.   As we have discussed JoJoDi could now obtain approval for all of its unencumbered cash to be paid out in the form of a dividend.   Please let us know how you would like to proceed in this matter …"

Owen stated the following in an email dated 10/17/2007:  "… Kathryn would be a good starting point in respect to establishing how to deal with the "non JoJoDi" business of Dar, Lucy, Future and the 10th, 11th and 12th Trusts given than [sic] Butterfield are the Trustee for each of the trusts and prepare the accounts for each of the entities.  Butterfield are also the Trustee of The Emerald STAR trust.  Anton Duckworth … acts on behalf of International Trust Protector being the Primary Enforcer of The Emerald STAR Trust …"

\* \* \*

The Source [Wheeler] identified the following emails[7] as pertaining to

---

[6]Mr. Pertierra testified that he was not advised that these e-mail records were taken from Womack's offices without her permission.  (Tr. at II-79)

[7]Mr. Pertierra testified that he was not advised that these e-mails were taken by Brandon Wheeler, who did not work for Womack, from Womack's offices without her permission.  (Tr. at II-94 to II-95)

14

Cayman transactions:

11/14/2007 RE: Cayman Trip
Womack requested preparation of Cayman financials and then requested that they be destroyed after Womack's review. Womack also discusses opening a safe deposit box.

11/7/2007 RE: Fax From 024046807310815600
Womack authorized payment and discussed services related to Womack's New York, Trump Tower Condominium.

11/2/2007 RE: Something to discuss
Womack discusses Cayman Trusts and bringing Rachel Bizzell on next trip to Cayman to fill director/executor roles.

10/2/2007 RE: NAIT Sell Off of Claims
Womack discusses with FFIC the sell off of JoJoDi's open claims.

03/05/2007 RE:
Butterfield asked Womack for collateral for Womack's Credit Cards in the names of Future Strategies, DAR and Lucy Limited.

(Tr. at II-34; Government's Ex. 46)

22. Special Agent Jobes testified that he had grounds to believe that records were located in the Cayman Islands without the electronic evidence provided by Brandy Wheeler and that he would have sought assistance to obtain records from the Cayman Islands even if he had never been provided electronic records from Wheeler. (Tr. at IV-166, IV-210) The references to e-mails that Special Agent Jobes included in his request for assistance to get foreign records came from a report prepared by Special Agent Witt pertaining to his interview of Wheeler and then later e-mails received from Wheeler through Special Agent Witt. (Tr. at IV-168 to IV-169; Government's Ex. 142) Other than this, Special Agent Jobes received no electronic evidence from Wheeler and the electronic evidence played no other role in his investigation. (Tr. at IV-169 to IV-170)

23. J.D. Carroll took over supervisory responsibilities for the exchange of information with the Cayman Islands in June 2014. (Tr. II-121, II-139) Mr. Carroll was contacted regarding a TIEA request to the Cayman Islands for information related to Cheryl Womack. (Tr. at II-139) Challenges were being made to the references to e-mails[8] in the TIEA request. (Tr. at II-140) Mr. Carroll testified that he

_____
[8]Mr. Carroll testified that he was not advised that these e-mail records were taken without Womack's permission. (Tr. at II-154 to II-155)

Case 4:13-cr-00441-GAF   Document 182   Filed 03/14/16   Page 15 of 22

believed that the request to the Cayman Islands was sufficient without the references to e-mails. (Tr. at II-140) Mr. Carroll reached out to the Cayman Islands Competent Authority to discuss the matter. (Tr. at II-141) The Cayman Islands Competent Authority decided to prepare a letter to state that they would have provided the same information if the treaty request had been written without the e-mail language. (Tr. at II-147; Government's Ex. 88) On October 13, 2014, the Cayman Island Competent Authority sent a letter to the United States Competent Authority which stated:

> In response to the clarification which you seek, I confirm that the Cayman Islands competent authority would have taken information gathering measures to obtain the requested records pursuant to a request that omitted all reference to the existence or content of emails that were included in the request dated October 8, 2010, or any subsequent requests. I have reviewed a request that does not include any reference to emails and find the facts sufficient to act pursuant to my obligations under the TIEA then in effect to obtain the requested records and to transfer those records to the United States in accordance with the TIEA. Had the original request relating to Verna Cheryl Womack lacked any reference to emails, I confirm that we would not have acted in any different manner and would have obtained and produced to the United States precisely the same records that were obtained and produced pursuant to the original and subsequent requests for records concerning Verna Cheryl Womack.

(Tr. at II-148; Government's Ex. 89) Mr. Carroll testified that in his experience, the Cayman Island Competent Authority would not have signed something like this if he did not believe it. (Tr. at II-150)

## III.  DISCUSSION

Defendant Womack seeks to suppress "the evidence stolen by … Brandy Wheeler which was subsequently illegally searched and seized by the government in violation of Ms. Womack's Fourth Amendment rights." (Motion to Suppress Electronic Evidence (doc #67) at 1) However, "[i]t is well-settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit government use of that information." United States v. Jacobsen, 466 U.S. 109, 117 (1984). Further, "what employees 'observe in their daily functions is

16

undoubtedly beyond the employer's reasonable expectation of privacy,' and thus if disclosed by an employee, is beyond the protection of the Fourth Amendment." United States v. Miller, 800 F.2d 129, 134 (7th Cir. 1986)(quoting Marshall v. Barlow's, Inc., 436 U.S. 307, 315 (1978)).  There is no Fourth Amendment violation when an employee seizes and turns over to authorities records which the employee believes evidence wrongdoing when the records serve as the basis of the employee's daily activities.  See Miller, 800 F.2d at 134 (citing United States v. Ziperstein, 601 F.2d 281, 289 (7th Cir. 1979).  Contrary to defendant Womack's argument, the existence of a nondisclosure agreement would not restrict an employee from turning over to authorities records which the employee believes evidence wrongdoing.  See United States v. Warshak, No. 1:06-CR-00111, 2007 WL 4410237, *9 (S.D. Ohio Dec. 13, 2007)("company cannot use … a confidentiality agreement to shield itself from government inquiry into evidence of potential illegal behavior"); In re JDS Uniphase Corp. Sec. Litig., 238 F.Supp.2d 1127, 1137 (N.D. Cal. 2002)(confidentiality agreements cannot be used to chill former employees from voluntarily participating in legitimate investigations into alleged wrongdoing by employer).

Brandy Wheeler (with the help of her brother) copied electronic files from her computer while employed by defendant Womack.  (See Fact No. 7, supra)  Wheeler had full access to the records she took as part of her work duties and she did not have to hack into the system. (Id.)  Wheeler logged in as herself and took her own e-mails and files from the F (financial) and S (shared) drives.  (Id.)  Wheeler had created the majority of the documents in the F and S drives.  (Id.)  Wheeler testified that she had full control over the documents in the F and S drives.  (Id.)  No files were copied that Wheeler did not have access to from her own work computer.  (Id.)  Wheeler copied the records because she feared being a scapegoat for

17

Cayman-related items and for leverage because she knew she would be in trouble for the embezzlement.[9]   (Id.)   Wheeler felt that her e-mails would provide proof of Womack directing her to do things.   (Id.)   While defendant Womack argues that Brandy Wheeler performed a private search, there was no search by Wheeler.   Rather, documents with which Wheeler was personally familiar were seized by Wheeler and provided to the authorities.   The Fourth Amendment was not violated because there was no official involvement in the seizure of the items; Wheeler performed a purely private seizure.   See United States v. Jackson, 578 F.2d 1162, 1163 (5th Cir. 1978)(stolen business records admissible where government authorities had no connection with seizure and no knowledge of it until after the fact); Gundlach v. Janing, 536 F.2d 754, 755 (8th Cir. 1976)("The fourth amendment affords no protection against a wrongful search and seizure of property by an individual absent any government participation.")   Cf. United States v. Klopfenstine, 673 F. Supp. 356, 360 (W.D. Mo. 1987)("The Fourth Amendment has been violated because there was warrantless *official* involvement in the seizure of the items, effectively done by the police, even though the initial discovery was private."); United States v. Stein, 322 F. Supp. 346, 348 (N.D. Ill. 1971)(where "it cannot be said that the government was totally divorced from the situation under which [a third person] came into possession of these records" and then turned over the records to the government, the Fourth Amendment was violated).

---

[9]Wheeler's copying (for her own purposes) of her e-mails and company records which she either prepared or which she used in her daily activities for the company is in sharp contrast to a case cited by defendant Womack, United States v. Brodie, 250 F.Supp.2d 462 (E.D. Pa. 2002), where evidence obtained from the former IT manager of a company was suppressed where the former IT manager had data tapes and a listing of data files of his employer at his home in case there was a system failure or loss of data on the company server.   The electronic evidence in Brodie was clearly the employer's property and no one presented any evidence to the contrary.   Id. at 464. No evidence was presented to suggest that the former IT manager believed that the electronic evidence was incriminating to the company.   Id. at 466.   Instead, the former IT manager provided the electronic evidence to the agent because he was told a trial subpoena would be issued for the tapes (which did not happen).   Id.

As set forth above, when an individual (defendant Womack) reveals private information to another (Brandy Wheeler), she assumes the risk that her confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit government use of that information. Wheeler provided extensive verbal information to the authorities prior to their receipt of any electronic evidence. (See Fact Nos. 7, 8, 9 and 11, supra) It is clear that the government could utilize Brandy Wheeler's statements concerning e-mails she sent and received while employed by defendant Womack as well as Wheeler's statements concerning documents she created and used as part of her work duties to prosecute Womack for violations of law. If that is the case, it cannot be said to infringe defendant Womack's privacy for the government to examine documents that were provided to them by Wheeler with which Wheeler is familiar and which she states will verify her allegations. "The advantage the Government gained thereby was merely avoiding the risk of a flaw in the employees' recollection, rather than in further infringing [defendant's] privacy." United States v. Jacobsen, 466 U.S. 109, 119 (1984). See also United States v. Rouse, 148 F.3d 1040, 1041 (8th Cir. 1998)(defendant not entitled to have items suppressed on Fourth Amendment grounds upon search by law enforcement agents where agents had already been provided information by private individuals who had seen items that these items were present as defendant's expectation of privacy had already been frustrated).

However, even if the Fourth Amendment is implicated, an exception to the Fourth Amendment exists. The Eighth Circuit Court of Appeals has provided the following guidance with respect to law enforcement officers' authority to inspect the contents of computer discs:

> Generally, the Fourth Amendment requires that a warrant be issued by a neutral magistrate on probable cause before an item can be searched or seized. There are, however, a few exceptions to the warrant requirement. If the government wishes to rely on an exception, it bears the burden of demonstrating

19

that the exception exists.

> … Consent to search, a valid exception to the warrant requirement, may be given either by the suspect or by some other person who has common authority over, or sufficient relationship to, the item to be searched. Common authority is a function of mutual use, joint access, and control, and is a question of fact.

United States v. James, 353 F.3d 606, 613 (8th Cir. 2003)(citations omitted). Brandy Wheeler signed a consent to search the disks. (See Fact No. 9, supra)

It is clear that Brandy Wheeler had common authority over her e-mails and the files from the F and S drives. Wheeler had created or received all of the subject e-mails and she had full control over files on the F and S drives. (See Fact No. 7, supra) The government produced evidence sufficient to show that Brandy Wheeler had the requisite authority to consent to the government's search of the electronic evidence. But, even if Wheeler did not in fact have authority to consent to the officers searching the disks, the Court finds that Special Agent Witt reasonably believed that Wheeler had the authority to consent. "[T]he rule for law-enforcement officers' reliance on a consenting party's apparent authority 'is not that they always be correct, but that they always be reasonable.'" United States v. James, 353 F.3d 606, 615 (8th Cir. 2003)(quoting Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990)). Special Agent Witt testified that it was his understanding that Wheeler had full access to the records she took as part of her work duties. (See Fact No. 7, supra) There is no Fourth Amendment violation regarding Brandy Wheeler's e-mails and the files from the F and S drives.

There was some electronic evidence provided to authorities by Brandy Wheeler with which Wheeler was not familiar, i.e. a laptop associated with CARD Aeronautics. (See Fact No. 10, supra) Further, Wheeler found and turned over to authorities some disks which were

copies of files from years earlier that Wheeler had at her home.[10]  (See Fact No. 9 at footnote 5,

supra)   In order to avoid any Fourth Amendment violations, the government may not exceed the

scope of what the private party actually viewed or had authority to view.   See United States v.

Walter v. United States, 447 U.S. 649, 657 (1980).   Thus, any evidence procured from the

CARD Aeronautics laptop would likely be suppressed.   While it appears that Wheeler was

familiar with the information on the old disks as she had used them in her work at VCW Holding,

(see Fact No. 9 at footnote 5, supra), the government has agreed that it will not use this evidence

at trial.   "The United States has concluded that the only items of electronic evidence obtained

from Wheeler that it intends to offer at trial are the contents of Wheeler's own email account."

(Government's Surreply (doc #134) at 1)   Further, it does not appear that this electronic

evidence provided the government with any leads in its case as the laptop was not examined

"until years later in preparation for the motions in this action," (see Fact No. 10, supra), and there

was no evidence presented to suggest that the old disks have been utilized by the agents (see Fact

Nos. 9 and 13).   Thus, any evidence provided by Wheeler to the government with which

Wheeler was not familiar and which was not used by the government in developing its case

against defendant Womack is a moot issue as the government has advised that it will not be used

at trial.

IV.   CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and

applicable law, enter an order denying Defendant Verna Cheryl Womack's Motion to Suppress

---

[10]While defendant Womack contends that these disks were stolen from Womack's locked fire
proof cabinet (see Defendant's Reply (doc #95) at 7), the evidence presented at the hearing does
not support this contention.

Illegally Searched and Seized Electronic Evidence (doc #67).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same.   A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.


_____/s/ Sarah W. Hays_____
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE

Case 4:13-cr-00441-GAF   Document 182   Filed 03/14/16   Page 22 of 22