**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.13-0441-01-CR-W-GAF |
| v. | ) | |
| | ) | |
| VERNA CHERYL WOMACK, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT WOMACK'S
SENTENCING MEMORANDUM**

COMES NOW Defendant Verna Cheryl Womack, by and through her counsel, and hereby files this Sentencing Memorandum and Motion for Downward Departure and/or Variance for this court's consideration. Ms. Womack's sentencing is scheduled for July 17, 2017 at 9:00 am. This Memorandum is filed to aid the Court in imposing a sentence which is sufficient but not greater than necessary to serve the objectives of sentencing as set out in 18 U.S.C. § 3553(a).

## I.     INTRODUCTION

On April 5, 2016, Ms. Womack pled guilty to count one of an indictment charging her with an attempt to interfere with the administration of the Internal Revenue Laws of the United States, in violation of 26 U.S.C. § 7212(a). The charge and resulting plea arose from Ms. Womack's false statements to a civil trial attorney for the United States Department of Justice Tax Division during a civil investigation of a tax advisor. She has admitted to falsely stating when a company known as JoJoDi was started and as to who

caused it to be started. She also admitted to falsely stating her knowledge as to the ownership of a company known as Lucy Limited. (See PSR para. 3).

Through her plea, Ms. Womack accepted full and complete responsibility for her false statements made during the above-referenced deposition and knows that she will live the rest of her life with the consequences.

Ms. Womack has been on pretrial release since she surrendered to authorities on December 6, 2013. Ms. Womack has not violated any condition of pretrial release. Since her release on pretrial supervision, Ms. Womack has continued gainful employment and has been a productive member of the community in which she resides. The Court has received Ms. Womack's Presentence Report (PSR) and the advisory United States Sentencing Guidelines (USSG) calculations. In the instant case, the PSR used the guideline found at USSG § 2T1.1 to initially calculate the total offense level as 24, the criminal history category as I with a guideline range of 51-63 months. As detailed below, the parties now agree that the total offense level is 22, the guideline range is 41-51 months, and the statutory maximum punishment upon conviction of 26 U.S.C. § 7212(a) resulting in a 36-month guideline recommendation.

As the Court knows, Ms. Womack's plea agreement pursuant to Rule 11(c)(1)(C) caps Ms. Womack's potential custody sentence at 24 months. She is free to request a non-custodial sentence, including either probation or placement on supervised release.

Based on substantial mitigating sentencing factors, including a substantial history of charitable acts, her age, anticipation that payment in full of the restitution amount the

parties jointly request to be ordered in this case will be made on or before sentencing, and an extraordinary amount of cooperation to narrow the sentencing issues, Ms. Womack respectfully moves for a downward departure and/or variance to a sentence of a term of probation, or perhaps a sentence of time served and placed on supervised release. Such a sentence would be fair and reasonable in light of the sentencing objectives set forth in Title 18 U.S.C. § 3553(a)(2).

## II.    OBJECTIONS AFFECTING GUIDELINES

There have been several meetings between defense counsel and the U.S. Attorney's Office that have resulted in the agreement that ¶¶ 102(c) and 102(d) not be considered as tax loss for guideline purposes. As explained herein, the parties now agree to the adjusted offense guideline, and the related concept of tax loss and restitution. Therefore, no sentencing factors are at issue other than consideration of a sentencing departure or variance. By agreement, the parties reserve the right at sentencing or in sentencing memoranda to argue their respective positions, including the nature and circumstances of the offense where deemed necessary.

In light of the parties' agreements, and pursuant to §§ 6A1.3 and 1B1.4 of the United States Sentencing Guidelines and Rule 32 of FRCRP, this Court is not required to rule on any remaining factual disputes that may arise. See 6A1.3 commentary; *U.S. v. Rodriguez*, 336 F.3d 67 (1st Cir. 2003) (no evidentiary hearing necessary where it was clear that defendant obstructed justice by inducing a fellow inmate to write a false letter); *U.S. v. Cantero,* 995 F.3d 1407 (7th Cir. 1993); *U.S. v. Montenegro-Rojo*, 908 F.2d 425, 429 n.3

(9th Cir. 1990). *U.S. v. Berndt,* 127 F.3d 251 (2nd Cir. 1997) (upholding denial of evidentiary hearing where disputed facts were inconsequential); *U.S. v. Bach*, 172 F.3d 520 (7th Cir. 1999) (upholding refusal to permit defendant to present loss exhibits that were irrelevant). The parties will argue any remaining factual issues at sentencing from the written record and sentencing memoranda.

On August 23, 2016, a preliminary presentence report was provided to the parties. Based on such disclosure, the government and defense counsel previously responded with objections to the report that are contained in five documents. This included a letter from the government dated September 7, 2016; an 84-page document and numerous exhibits submitted by the defendant on December 12, 2016; a letter from the defendant dated February 9, 2017, responding to the government's objections and comments; and a letter submitted by the defendant dated March 8, 2017, responding to the government's letter dated February 22, 2017.

## III. DEFENDANT'S POSITION REGARDING PSR AND GUIDELINES

After disclosure of the presentence report to the parties, changes that did not impact the guidelines have been made to the defendant's race and age on page 2, as well as paragraphs 1, 2, 4, 6, 7, 9, 10, 12, 13, 29, 37, 50, 59, 61, 62, 97, 98, 106, 108, 141-142 (proof of education), 174 and 175 of the report. Changes that did impact the guidelines were made to paragraphs 110 (base offense level), 113 (role in the offense-narrative section), 114 (obstruction enhancement removed), 115 (corrected adjusted offense level), 118 (additional 1-level reduction for acceptance of responsibility removed), 119 (corrected

total offense level) and 172 (guideline calculations), 183 (restitution calculation).  Should the court accept the joint recommendation of the parties, there would either be a finding in court that changes the final adjusted guidelines and restitution or a final revision to paragraphs 115, 119, 172 and 183 of the PSR.

## A.  Agreed Changes to PSR paragraph 102 – Five Categories of Tax Loss

As referenced in this introduction, Ms. Womack has facilitated the efficient resolution of this case.  Not only has she pled guilty, but she has also produced meaningful information to assist the parties in refining the issues before this Court.  This Honorable Court may recall the suggestion that the parties meet and confer before this sentencing hearing.  In fact, numerous meetings have occurred between representatives for the United States and Ms. Womack.  The discussions were augmented by research and investigation to assist the parties in understanding the issues.  These discussions resulted in a significant narrowing of the issues.

After *Booker*, *infra*, the trial court has discretion to grant a variance based upon the notion of extraordinary acceptance of responsibility.  *See, United States v. Severino*, 454 F.3d 206 (3d Cir. 2006) (district noted its discretion, but under the facts did not exercise it).  Similarly, in affirming a government request for a downward departure, a court considered the effect of a global plea agreement that resulted in significant savings of judicial time by resolving two potential jury trials.  The court noted, "[t]he global plea agreement is an innovative mechanism through which the government and the court avoid expensive time-consuming litigation.  Defendants in this case were to be tried in two

5

consecutive jury trials, anticipated to last seven to nine weeks." *United States v. Mastronardo*, 22 F. Supp. 3d 490 (E.D. Pa. 2014). Here, Ms. Womack's willingness to submit matters on the written record and ability to actively work with counsel to narrow very complicated loss and restitution issues is worthy of consideration of a downward departure or variance. Her cooperation has avoided the necessity of a five-day sentencing hearing. In *United States v. Nguyen*, 212 F.Supp. 1008, 1022-23 (N.D. Iowa 2002), the court noted, "[t]he Eighth Circuit Court of Appeals has repeatedly recognized departures under the theory of extraordinary acceptance of responsibility when the circumstances of the case are truly exceptional and outside the heartland of section 3E1.1. … Thus, a departure on the ground of extraordinary acceptance of responsibility is a proper basis upon which to depart if, as *Koon* and guideline 5K2.0 direct, a defendant's acceptance of responsibility 'is present to an exceptional degree or in some other way [is] different from the ordinary case where the factor is present.' 518 U.S. at 96, 116 S.Ct. 2035 (citation omitted); *see also* U.S.S.G. § 5K2.0." *See, United States v. Garcia*, 926 F.2d 125 (2nd Cir. 1991). The government attempts to discount the defendant's cooperation. (*See*, Gov't. Sent. Memo. at p. 35). However, the arguments cited by the government do not adequately capture the defendant's cooperation to narrow the sentencing issues, and gives little recognition that under the advisory sentencing guidelines, variance factors cast a wider net under 18 U.S.C. § 3553(a). *Gardellini, infra*.

**<u>Overview-Unreported Income/Disallowed Tax Deductions (Determination of Loss)</u>**

Based upon the exchange of information between the parties and extensive discussions, the changes to five areas of loss identified in **paragraph 102** of the PSR are based upon the following:

a) **<u>2008 Wine Sale:</u>** Ms. Womack sold the Lucy Ltd wine collection for $1,613,899.89 and failed to report the sale as income. The sale amount is supported by Sotheby's and Lucy Limited documents indicating the price paid for the wine. The parties now agree Ms. Womack is permitted to claim a basis of $762,324, and also agree Ms. Womack reported income of $298,357.00, resulting in unreported net income of $502.618.89. This net income earned in the United States should have been, but was not, reported by Ms. Womack**.**

b) **<u>2000 JoJoDi purchase of Trump Tower condominium:</u>** It is the Defendant's position that JoJoDi purchased the Trump Tower condominium in 2002 for $2mm in New York, New York as an investment property to increase the value of assets held by JoJoDi. The investment was approved by the Cayman Islands Monetary Authority. The property has at least doubled in value since its purchase. JoJoDi named Ms. Womack as the property manager of the condominium and Ms. Womack is permitted to stay at the condo when she visits New York. For purposes of sentencing, the parties agree to include this purchase as unreported income attributable to Ms. Womack. Although Ms. Womack does not possess the legal authority to sell the condominium purchased as an investment by JoJoDi, she has

agreed as part of the resolution of the sentencing issues to accept this purchase as part of the guideline tax loss and associated restitution.

c) **(Withdrawn) 2001 JoJoDi loans to Womack entities:** The parties agree that this transaction, for various reasons detailed herein, is not to be considered as relevant conduct. If necessary, it may be considered as part of the matters under civil litigation and related issues in *V. Cheryl Womack v. Commissioner of Internal Revenue, T.C. Case No. 26161-06, V. Cheryl Womack v. Commissioner of Internal Revenue, T.C. Case No. 5293-08, V. Cheryl Womack v. Commissioner of Internal Revenue, T.C. Case No. 5956-09, Card Aeronautics, LLC, VCW Holding Co., LLC, Tax Matters Partner v. Commissioner of Internal Revenue, T.C. Case No. 30047-07.* The parties agree in 2001 JoJoDi Insurance Company Cayman, a Cayman Island company, loaned approximately $500,000 to R&A Properties (owned by Cheryl Womack) and loaned $4mm to MySIS, LLC (also owned by Cheryl Womack). The parties also agree JoJoDi received installment payments and acknowledged full repayment of these loans in 2006 and 2007, respectively. Whether or not either loan should be deemed income to Ms. Womack, particularly in light of the subsequent repayment of each loan, is a sufficiently complicated transaction more appropriately considered in the civil tax cases currently pending in tax court.

d) **(Withdrawn) 2002 Basis for NAIT**: The parties agree that this transaction, for various reasons, is not to be considered as relevant conduct. It may be considered as part of the civil litigation and related issues in *V. Cheryl Womack v. Commissioner of Internal*

Revenue, T.C. Case No. 26161-06, V. Cheryl Womack v. Commissioner of Internal Revenue, T.C. Case No. 5293-08, V. Cheryl Womack v. Commissioner of Internal Revenue, T.C. Case No. 5956-09, Card Aeronautics, LLC, VCW Holding Co., LLC, Tax Matters Partner v. Commissioner of Internal Revenue, T.C. Case No. 30047-07. *See* U.S.S.G. § 2T1.1 App. Note 2. The parties agree that the sale of NAIT, Inc. is a different type of tax loss question centered upon the tax treatment of the sale of a United States domestic subchapter S-corporation. The potential tax on the capital gain from this NAIT, Inc. sale transaction is unrelated to any questions concerning taxable transactions involving controlled foreign corporations, off-shore accounts, companies or trusts, all of which are at the heart of the government's theory of prosecution in this case. Thus, the nature of this transaction is outside the government's theory of prosecution in this case. Because the sale transaction is not similar or related to the Cayman Islands entities, the transaction is not properly considered relevant conduct under 2T1.1, Note 2.

> Total tax loss attributable to the offense. In determining the total tax loss attributable to the offense (see 1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan *unless the evidence demonstrates that the conduct is clearly unrelated.*

*See* USSG § 2T1.1 Note 2 (emphasis added). The parties agree that the sale of the NAIT, Inc., program is unrelated to the transactions involving the Cayman Islands entities and trusts.

Further, the parties agree that any attempt to determine the tax loss, if any, for this transaction will be unduly complicated and will unnecessarily prolong the sentencing hearing. The sale was effectuated pursuant to an Asset Purchase Agreement ("APA"), and the purchase price was composed of several elements. NAIT received a cash payment of $25,066,395.00 at closing in 2002, NAIT another payment of $5,801,929.92 pursuant to the APA in 2003, and finally, in 2008, NAIT received another payment of $5,280,059.00, following an arbitrated dispute over further payments due under the APA. Determining the appropriate tax consequences for each year in which a payment was received creates a significantly complicated tax issue, particularly in light of other tax issues during the relevant tax years. For these reasons, the parties agree the determination of tax loss, if any, is properly deferred to the currently pending civil tax cases.

e)  **1995-2001 VCW, Incorporated consulting fees and rent payments:** The parties agree that a reasonably accurate figure for consulting fees and rent payments is $3,084,600.30. The parties have reviewed the facts, financial records, and engaged in discussions in arriving at this figure.

In reaching an agreement regarding these five categories of tax loss, the parties met and conferred on numerous occasions. During these conferences, the defendant through her lawyers provided the government with additional information and documents in an effort to clarify key facts. As a result of this exchange of

information, the parties agreed under the law and facts to remove subsections 102(c) and 102(d) from consideration as relevant conduct at sentencing.

For illustrative purposes, the following chart summarizes the parties' joint agreement regarding the unreported income and tax loss in this case. This detailed report is cross-referenced to paragraph 102 of the PSR.

### *DETAILED REPORT REGARDING PARTIES AGREED TAX LOSS*

**PSR paragraph 102(a): 2008 Lucy Limited, LLC wine sale**

| **2008 WINE SALE** | **PSR 102(a)** | **Comment** | **Agreed 102(a) unreported income** |
|---|---|---|---|
| Sale Proceeds | $1,613,899.89 | | $1,613,899.89 |
| Cost of Goods Sold | | Lucy Ltd consulting income is attributed to Womack (see PSR paragraph 102(e)). This consulting income was used to purchase wine. The parties agree Womack is, therefore, permitted to claim a cost basis in the wine sold; *see* 2008 Lucy Ltd financial statement Note 3, Cost of Goods Sold Calculation | $(762,324.00) |
| Less Management Fee reported as income | | This management fee is reported as "other income" on VCW Holding 2008 Form 1065 line7 | $(298,957.00) |
| Less Rental Income reported as income | | Lucy Ltd. Financial records produced by Ms. Womack provide documentary support for these figures. | $(50,000.00) |
| Total unreported income | $1,613,899.89 | | $502,618.89 |

**PSR paragraph 102(b): 2000 Trump Tower purchase**

| 2000 purchase of TRUMP TOWER | PSR 102(b) | Comment | Agreed 102(b) unreported income |
|---|---|---|---|
| Purchase Price | $2,500,000.00 | Womack produced an expert report and other information as to the formation of the Emerald Star Trust and its ownership of JoJoDi. The government provided its expert report to the contrary. Womack has no current authority to sell the Trump Tower condominium. Yet, she has agreed for purposes of sentencing to include this purchase as individual unreported income. | $2,500,000.00 |

**PSR paragraph 102(c): 2001 JoJoDi loans to Womack entities**

| 2001 JoJoDi Loans to Womack entities | PSR 102(c) | Comment | Agreed 102(c) unreported income |
|---|---|---|---|
| JoJoDi loan to Mysis | $4,000,000.00 | In August 2007, the Mysis loan was repaid in full with after-tax dollars. Womack's personal Vestor account was liquidated and transferred to Mysis to pay the balance of funds owed. Womack reported the Vestor capital gain for tax purposes. | |
| JoJoDi loan to R&A Properties | $537,500.00 | In March 2006, the R&A Properties loan was repaid in full with after-tax dollars. | |
| Total unreported income | $4,537,500.00 | | $0.00 |

**PSR paragraph 102(d): 2002 Basis for NAIT**

| 2002 Basis for NAIT | PSR 102(d) | Comment | Agreed 102(c) unreported income |
|---|---|---|---|
| Sale Price | $34,000,000.00 | | |
| Claimed basis | $(18,000,000.00) | Mr. Al Davison determined the amount of basis claimed for tax purposes. Additionally, Mr. Davison signed the 2002 tax return. | |
| Total unreported income (overreported basis) | $16,737,785.00 | The sale of the NAIT, Inc. program was entirely a domestic transaction and is outside the heart of the government's theory of prosecution in this case and is not relevant conduct. Further, the parties agree that any attempt to determine the tax loss, if any, for this transaction will be unduly complicated and will unnecessarily prolong the sentencing hearing. For these reasons, the parties agree the determination of tax loss, if any, is properly deferred to the currently pending civil tax cases. | $0.00 |

**PSR paragraph 102(e): The PSR indicates VCW, Inc. paid consulting fees to Lucy Limited of $25,000 per month between 1995 and 2001. The government originally contend VCW, Inc. paid Lucy Ltd consulting fees estimated at $300,000 per year for years 1995 – 2001 totaling $2,000,000. Government agrees to a reduced consulting fee expense amount as noted.**

| CONSULTING FEES | PSR 102(e) | Comment | Agreed 102 (e) unreported income |
|---|---|---|---|
| 1995 | $300,000.00 | no payments made | $- |
| 1996 | $300,000.00 | From Lucy Ltd financial statements | $321,438.75 |
| 1997 | $300,000.00 | From Lucy Ltd financial statements | $257,070.23 |
| 1998 | $300,000.00 | From Lucy Ltd financial statements | $150,000.00 |
| 1999 | $300,000.00 | From Lucy Ltd financial statements | $250,000.00 |
| 2000 | $300,000.00 | From Lucy Ltd financial statements | $350,000.00 |
| 2001 | $300,000.00 | From Lucy Ltd financial statements | $300,000.00 |
| 2002 | | From Lucy Ltd financial statements | $300,000.00 |
| 2003 | | From Lucy Ltd financial statements | $50,000.00 |
| Totals | $2,100,000.00 | | $1,978,508.98 |

**PSR paragraph 102(e): The PSR indicates VCW, Inc. paid rent expense to DAR in the amount of $25,000 per month between 1995 and 2001. The government originally contends VCW, Inc. paid DAR rent expense estimated at $300,000 per year for years 1995 – 2001 totaling $2,000,000. Government now agrees to reduced number.**

| RENT EXPENSE | PSR 102(e) | Comment | Agreed 102 (e) unreported income |
|---|---|---|---|
| 1995 | $300,000.00 | DAR condo did not exist in 1995 | $0.00 |
| 1996 | $300,000.00 | Womack paid down payment of $390,000 with personal post-tax dollars | $0.00 |
| 1997 | $300,000.00 | Womack paid the balance due to finalize the purchase of the DAR condo with personal post-tax dollars - total amount paid for condo is $701,000. Parties agree to give Womack credit for personal funds paid against any possible rental income. | $0.00 |
| 1998 | $300,000.00 | VCW Admin financial records | $207,230.14 |
| 1999 | $300,000.00 | VCW Admin financial records | $163,899.00 |
| 2000 | $288,850.00 | VCW Admin financial records | $304,277.13 |
| 2001 | $300,000.00 | VCW Admin financial records | $260,685.05 |
| 2002 | | VCW Admin financial records | $300,000.00 |
| 2003 | | VCW Admin financial records | $50,000.00 |
| Condo expenses | | $30,000 expenses per year allowed for each year 1998-2003 | $(180,000.00) |
| Totals | $2,088,850.00 | | $1,106,091.32 |

**B.     Agreed Changes to PSR paragraph 103 – Total Tax Loss / Restitution**

The above unreported income or disallowed deductions results in a total unreported income amount of $6,087,219.19. Pursuant to §2T1.l(c)(l)(A), 28% of the unreported income is the tax loss in this case. Therefore, Womack should be attributed with a tax loss of **$1,704,421.37.**

| Tax Year | Loss Amount |
|---|---|
| 1995 | $0 |
| 1996 | $321,438.75 |
| 1997 | $257,070.23 |
| 1998 | $327,230.14 |
| 1999 | $383,899.00 |
| 2000 | $3,124,277.13 |
| 2001 | $530,685.05 |
| 2002 | $570,000.00 |
| 2003 | $70,000.00 |
| 2008 | $502.618.89 |
| **Total Unreported Income** | $ 6,087,219.19 |
| **Total Tax Loss (28%)** | **$ 1,704,421.37** |

## IV.     18 U.S.C. § 3553(a) SENTENCING FACTORS

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court determined that district courts must consider all of the sentencing factors under 18 U.S.C. §3553(a)(1) -(7) without giving mandatory weight to the Guidelines. Post *Booker*, after determining the Guideline ranges and any permissible departures within the Guidelines structure, the court

must determine whether a non-Guidelines sentence is appropriate. *United States v. Myers,* 503 F.3d 676, 684 (8th Cir. 2007).

Once the Court has calculated the correct guideline range, the Court then has a "responsibility to select a sentence that [is] sufficient, but not greater than necessary to comply with the statutory sentencing purposes." *United States v. Gray,* 577 F.3d 947, 950 (8th Cir. 2009) (quoting 18 U.S.C. § 3553(a)); see also *United States v. Butler,* 594 F.3d 955, 967 (8th Cir. 2010) (same).

As the Supreme Court has long recognized, "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). With the United States Sentencing Guidelines now rendered "advisory only," *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007), a district court has substantial discretion in fashioning a sentence appropriate to the individual circumstances of the defendant and the unique facts of the offense. While the Court must consider the Guideline range in a case, "the Guidelines are not the only consideration." *Gall v. United States*, 128 S. Ct. 586, 597 (2007). See *Kimbrough*, 128 S. Ct. at 564 ("the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

In analyzing a motion for downward variance, a "district court has wide discretion to weigh the factors in each case and assign some factors greater weight than others[.]"

United *States v. Kane,* 552 F.3d. 748, 755 (8th Cir. 2009). "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented." *Id. (quoting Gall v. United States,* 128 S.Ct. 586, 597 (2007); *see, e.g., Nelson v. United States,* 129 S.Ct. 890, 892 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable."). "[I]t will be the unusual case when we reverse a district court sentence – whether within, above, or below the applicable Guidelines range – as substantively unreasonable." *quoting United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008))."

As articulated in 18 U.S.C. § 3553(a), this Court is required to consider the following factors in imposing a reasonable sentence:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the sentencing Guidelines applicable to the offense;

(5)     any pertinent policy statement;

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victim of the offense.

Ms. Womack asserts that application of these factors to the facts of her case demonstrates that a sentence of a term probation, or perhaps a sentence of time served, with a term of supervised release with any reasonable special condition deemed appropriate would satisfy the goals of sentencing.

### 1. Nature and Circumstances of the Offense and the History and Characteristics of Cheryl Womack

#### Circumstances of the Offense

As the PSR recounts, this criminal investigation arose in 2008 when the government filed a civil action against Allen ("Al") Davison. Ms. Womack was not a party to the civil litigation but she was questioned as to her knowledge of certain facts. Regrettably, her fear as to the government's position with respect to certain tax strategies envisioned by Al Davison and, in some instances, relied upon by her, contributed to her decision to falsely respond to some of the questions posed. She did not want to cause difficulty for Mr. Davison. Unfortunately, her misplaced sense of loyalty lead to the currently pending charges. Even the offense conduct and relevant conduct attributed to Ms. Womack as alleged by the government ceased as long ago as 2008 (PSR at para. 103). To be clear, this is offered as background information and not as an excuse or justification.

In arguing its sentencing position, the government's emphasis is focused primarily on the offense conduct. To be sure, the offense conduct, including relevant conduct, is one sentencing factor under 18 U.S.C. § 3553(a). It is no more significant than any other 3553(a) factor. Ms. Womack has accepted responsibility as to significant areas of relevant conduct reflected in the restitution and tax loss adjustment guideline. It is also a sentencing

19

mitigator that Ms. Womack has been a victim of a significant embezzlement by a former employee and comptroller, who was sentenced to one year and a day. (PSR at para. 10).

As further background, Ms. Womack's interest in the Cayman Islands started in 1995, as a result of her desire to grow the profitability of the NAIT program policies. John Shea, then Vice President of Fireman's Fund Insurance Company, suggested that Ms. Womack establish a captive reinsurance company offshore because state insurance regulators in the United States made it difficult to initiate a small reinsurance company. Mr. Shea suggested Ms. Womack consider the Cayman Islands or Bermuda to establish a company because both jurisdictions had laws and regulations that allowed for the formation of smaller reinsurance companies when those companies were backed by larger insurance companies. Mr. Shea was instrumental in guiding Ms. Womack's efforts of initiating a captive off-shore reinsurance company, MFC Insurance Company of the Caymans. "MFC" was an abbreviation for "My First Captive." MFC and Fireman's Fund entered into an arrangement wherein MFC would pay out the first $250,000 of any individual insurance claim under the NAIT program policies underwritten by Fireman's Fund. Under this agreement, NAIT collected the insurance premium from policy holders and forwarded those premiums to Fireman's Fund. Fireman's Fund took a ceding commission and a commission for the insurance agent and wired the remaining funds to MFC. MFC invested the premiums in an effort to earn returns larger than the losses paid on insurance claims. PAS paid out all loss claims against NAIT policies. Fireman's Fund reimbursed PAS through funds withdrawn from MFC's Cayman Islands investment accounts. From MFC,

the business evolved into the Emerald Star Trust and JoJoDi Insurance Company of the Cayman Islands. It is undisputed that Ms. Womack was advised by several different advisors regarding the business entities and trusts set up in the Cayman Islands. Ms. Womack did, however, make false statements to the government when asked about JoJoDi as well as Lucy Limited, another Cayman Island entity. As stated earlier, she accepts responsibility for her conduct.

In further support of its requested sentence, the government points to an alternative proposed guideline calculation pursuant to U.S.S.G. § 2J1.2, asserting the obstruction guideline recommends a sentence of at least 24 months. If the court were to apply § 2J1.2 based upon the stipulated facts of the guilty plea in this case, only one of the proposed enhancements would apply. In *United States v. Neilson*, 721 F.3d 1185 (10th Cir. 2013), the Tenth Circuit made clear that the appropriate way to choose between § 2J1.2 and § 2T1.1 when sentencing a defendant following a guilty plea to the omnibus clause of § 7212(a) was by "[c]omparing the stipulated conduct to the conduct covered under each guideline." *Id.* at 1188; *see also id.* at 1189 ("The question is simply whether the conduct he ultimately admitted to was more akin to Section 2T1.1's tax evasion and related taxation offenses than to Section 2J1.2's obstruction of justice offenses . . . ."). The stipulated conduct in this case, as recognized at the change of plea hearing, was the factual basis in the plea agreement involving two statements under oath.

The §2J1.2(b)(2) enhancement for "substantial interference with the administration of justice" applies only when the offence results in "improper termination of a felony

21

investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2(b)(2) (Application Note 1). The government points to no facts that would support application of this enhancement.

If the court were to apply § 2J1.2(a), the base offense level would be 14, and, as suggested above the 2J1.2(b)(2) enhancement is not applicable. The defendant concedes that U.S.S.G. § 2J1.2(b)(2) is applicable. After a reduction for acceptance of responsibility under § 3E1.1(a), the total offense level would be 14. The resulting applicable guideline range would be 15 to 21 months. So, while the parties now agree this guideline does not apply, the government's effort to use § 2J1.2 for comparative purposes falls somewhat short of the government's intended effect.

The government argues its position regarding Ms. Womack's motivation for the various transactions in pages 4 through 14 of its memorandum. Some of the government's assertions do not affect the guidelines or other sentencing considerations. None of the government's assertions acknowledge that the reinsurance industry generally used offshore locations at all relevant times. Again, Ms. Womack has plead guilty to the facts set forth in the factual basis and has further agreed to significant key areas of relevant conduct, including especially the tax loss as detailed above.

## Characteristics of Cheryl Womack

At nearly 67 years old, Cheryl Womack stands before this court with no history of arrests, convictions or juvenile adjudications. Throughout her life, she has been a productive and charitable member of her community.

Ms. Womack was born in Kansas City, Kansas. She was one of 11 children (PSR at ¶ 29). She attended Wyandotte High School but withdrew to care for her siblings. She earned a GED and attended the University of Kansas (PSR at ¶¶ 141-142). She married Walter Womack in 1970 and was divorced in 1981. No children were born from the marriage. She was married from 1981-1997 to Dwight Elliott and they had two children now ages 30 and 31. She has been married to Gordon Pearson since 1999 (PSR at ¶ 134).

Ms. Womack started and grew a very successful business enterprise that supported the trucking industry, generally referred to as the NAIT Program. From 1985 to 2002, Ms. Womack grew the domestic NAIT Program to the point that she employed several dozen people and insured more than 14,000 independent truck drivers in the United States and Canada. She sought to foster a company culture that supported working families—including by providing on-site child care for pre-school-aged children—and encouraged community service. Working Mother Magazine named VCW, Inc. one of the 100 Best Companies for Working Mothers in 1996, and the Kansas City Business Journal named it as one of top private companies in 1995 and 1996, and one of the top 25 women-owned businesses in 1997. Ms. Womack sold the NAIT Program in April of 2002. Following the sale, Ms. Womack created VCW Holding Co., LLC, an entity she envisioned being venture

capital business that invested in a wide array of new and established companies. The Kansas City Business Journal named VCW Holding as one of ten finalists for the "Best Places to Work" (small business) awards in 2006.

Ms. Womack's offense conduct is completely at odds with her personality and actions as observed by her family and acquaintances, many of whom have written letters of support for this court's consideration at sentencing. Without exception, all of the letter writers hold Ms. Womack in very high regard, telling a life story of a woman who selflessly gives her time and support to many positive activities within her community – as a mother, an entrepreneur, a friend, and a community volunteer. Ms. Womack's life has positively impacted a tremendous number of people in her community.

Her brother, Robert Arrocha, writes a very compelling letter as to how Ms. Womack was raised along with eleven other children. He describes the pressures that she successfully faced and endured. Her father was an immigrant from Panama and her mother was a person who dropped out of high school in Oklahoma. "The result was a tyrannical father and an obedient wife attempting to raise eleven children in the United States utilizing parenting techniques that would eventually result in the removal of three children by the courts." (In fact, Cheryl Womack brought the litigation to protect her siblings by adopting them when she was a young college student.) Mr. Arrocha goes on to explain, "Physical and verbal abuse were the norm, not the exception." The abuse was both verbal and physical. And yet, Ms. Womack helped her own siblings, gained an education, and became a leader in the business community.

Ms. Womack has a significant history of charitable works that mitigate in favor of the requested sentence. Her charitable acts do not simply date back to post-indictment efforts. Ms. Womack has a longstanding and verifiable history of giving to others.

While the 100-plus character letters that have been provided to the Court in advance of sentencing speak for themselves, several examples of Ms. Womack's charity and philanthropic efforts are worth including in this memorandum.

- Significant donations to KU athletics, including the softball field named for her father
- Helped sustain Operation Breakthrough during trying times
- Founded the Leading Women Entrepreneurs of the World, Inc. which was recognized by Michael Bloomberg, former Mayor of the City of New York
- Supporter of the Police Athletic League, the Lyric Opera Ball and Mario's Closet
- Recipient of a Proclamation honoring her and the employees of VCW by then-Kansas City Mayor Mark Funkhouser

Neal Patterson with Cerner Corporation, mentioned her significant investments in early-stage companies that contributed to job growth in the region. According to Bill Self, she has contributed to his "Assist Foundation," a program to give youth access to better lives. She has served as a guest speaker for college programs emphasizing how to start a business, as noted by Neal Sharma with DEG. Ms. Womack has helped Treads and Threads, a cause focused on fighting cancer, and sponsored by the Kansas Speedway Development Corporation. Jeff Boerger, its President, described her contributions to this cause. Jeffrey Lind, President of Nebraska Furniture Mart, discussed her work with business leaders in managing organizations and the importance of people. She earned the Council of Growing Companies National Bootstrap Award. Jack Zimmerman of

Zimmerman Construction pointed out that Ms. Womack makes it a high priority to meet the spouses and children of her employees.

In *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009), the defendant faced a guideline sentencing range of 12-18 months' imprisonment. The district court sentenced the defendant to one year of home confinement. One of the principal factors cited in the court's § 3553(a) analysis was the defendant Tomko's "involvement in exceptional charitable work and community activity." In affirming the sentence, the Third Circuit held that the district court's reliance on the defendant's charitable works was both "logical and consistent with the factors set forth in § 3553(a)." Interestingly, Tomko's charitable acts were post-indictment, and noted by the appellate court to be "less than sincere," however, the *Gall*-mandated "abuse of discretion" standard of appellate review required the circuit court to defer to the sentencing judge - who was "on the ground and [could] better separate sincerity from self-seeking." Ms. Womack's charitable works are neither post-indictment nor "less than sincere" and can be the basis for a variance.

Even a cursory review of the letters provides the court with a consistent theme – Cheryl Womack is a loving, caring, compassionate person, willing to assume many responsibilities for the betterment of others – all without fanfare or the expectation of public accolades. Cheryl Womack is a positive force who is integral to her family and the community at large.

Ms. Womack recognizes the damaging effects that her conduct had on herself, her loved ones and society at large. She enjoys the support and encouragement of a large group

of friends and family members who both hold her accountable and support her efforts to continue to be an active and productive member of her community. There is little danger that Ms. Womack will ever reoffend.

**2.      The Need for the Sentence Imposed to Promote Certain Statutory Objectives.**

### To Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the offense.

A lengthy sentence of incarceration is not always necessary in order to satisfy this sentencing mandate. Indeed, as observed by the District Judge in *Gall*, probation (or post-release supervision), "rather than an act of leniency, is a substantial restriction of freedom." *Gall*, 128 S.Ct. at 593.

As renowned criminologist Norval Morris has consistently argued, and as reflected in recent Supreme Court decisions, when determining punishment, "the least restrictive (punitive) sentence necessary to achieve defined social purposes should be imposed." Norval Morris, The Future of Imprisonment, University of Chicago Press (1974), p. 59.

Ms. Womack concedes that she must be appropriately punished for her actions. Ms. Womack will forever have a federal felony conviction on her record, a stigma that has serious consequences. Collateral consequences for Ms. Womack include no longer serving on boards and foundations of publicly held entities. This is a real adverse consequence to someone likely Cheryl Womack. *See, United States v. Stewart*, 590 F.3d 93 (2nd Cir. 2009) ("The district court is specifically required by section 3553(a) to consider the 'just punishment for the offense.'… It is difficult to see how a court can properly calibrate a

'just punishment' if it does not consider the collateral effects of a particular sentence.")  A sentence of probation, or a sentence of time served, with any reasonable terms of supervised release with any reasonable special conditions deemed appropriate by this Court will undoubtedly satisfy the statutory objective of providing "just punishment for the offense" to which she pleaded guilty in this case.

### To Afford Adequate Deterrence to Criminal Conduct, and To Protect the Public from Further Crimes of the Defendant.

Ms. Womack's conduct in this case is uncharacteristic of the way she had conducted herself personally and professionally throughout her entire life up to, and since, the instant offense. She has no prior criminal history.  The conduct at issue in this case occurred while Ms. Womack was in her 50's. The defendant presents low risk of recidivism.  Defendants "over the age of 40...exhibit markedly lower rates of recidivism in comparison to younger defendants.  "Recidivism rates decline relatively consistently as age increases, from 35.5% under age 21 to 9.5% over 50." See *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, at 12, 28 (2004).  Many courts have recognized this factor in sentencing. *United States v. Lucania*, 379 F.Supp.2d 288, 297 (E.D.N.Y. 2005) ("Post-*Booker* courts have noted that recidivism is markedly lower for older defendants.").  *United States v. Carmona-Rodriguez* 2005 WL 840464, *4 (S.D.N.Y. April 11, 2005) (unpub.) (Where 55-year-old woman pled guilty to distribution of drugs sentence of 30 months (below guideline range) proper in part "in view of the low probability that Carmona-Rodriguez will recidivate.")

Title 18 USC §3553(a)(2)(B)'s directive that the sentence imposed afford adequate deterrence to criminal conduct does not require a lengthy term of imprisonment. The fact that Ms. Womack was investigated, prosecuted, and pled guilty for her actions should be sufficient to deter potential offenders. In addition, for individuals such as Ms. Womack, the tarnishing of their reputation as a result of their actions has a significant deterrent effect, perhaps as strong as any formal punishment meted out by the criminal justice system. The lifelong stigma of being a federal felon, along with a term of probation or supervised release acts as a deterrent to other similar individuals contemplating this type of offense.

Further, when examining the life of Cheryl Womack, including the fact that unlike many defendants appearing before this Court, she has never had an arrest or conviction, and considering her compliance with the law and successful pretrial supervision, leads to the conclusion she is not a danger to the community. The likelihood that Ms. Womack will commit future fraudulent conduct is virtually nonexistent.

### To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner.

Ms. Womack's education is set out earlier in this memorandum. Ms. Womack suffers from no mental health disorders or substance abuse issues and does not require any treatment in this regard. In short, this sentencing factor simply does not apply to Ms. Womack. In fact, the information provided with regard to this factor can be considered a sentencing mitigator. She is well educated and can continue to be a productive member of society.

**6.      The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

The guidance set out in § 3553(a)(6) to prevent a disparate sentence among defendants with similar backgrounds *found guilty* of similar conduct is a difficult comparison given the lack of charged cases within this Circuit.  At least some comparison to another case with similar conduct can be made - Allen Davison. In a May 11, 2010, Order, this Honorable Court enjoined Mr. Davison from "organizing, establishing, promoting, selling, offering for sale or helping to organize, establish, promote, sell or offer for sale any tax plan…, involving sham parallel C management companies, sham 412(i) plans, sham flock contracts or any other illegal tax scheme, plan, or device, even if not specifically addressed herein.  Additionally, Davison shall not organize, establish, promote, sell, offer for sale or assist in any financial or tax related arrangement without submitting in writing to an IRS designed, a detailed plan explaining the financial or tax arrangement and all steps necessary for the arrangement to be legal under the tax code." In the Davison matter, the IRS estimated that Davison's tax-fraud schemes have cost the United States at least $45 million in uncollected revenues.  Mr. Davison has not been prosecuted.   Nor have any of the substantial number of clients advised by Mr. Davison been criminally prosecuted to the best of counsel's knowledge.

These facts are offered solely for mitigation and in further support of the 18 U.S.C. § 3553(a) factors that should be considered for sentencing.  It is not a criticism of the government's charging decisions.  However, a sentence of 24 months for Ms. Womack is not proportionate, nor is it necessary, to achieve the goals of sentencing.

30

Based on this information, Ms. Womack asserts that a sentence of five years of probation, or a sentence of time served, and placing her on a period of supervised release, and any reasonable special conditions deemed appropriate would avoid unwarranted sentencing disparities among defendants that appear to be similarly situated to the present case.

There are two legal reasons to consider this argument. First, after *Koon v. United States*, 519 U.S. 990 (1996), some courts have reconsidered past decisions regarding the use of disparity departures. *See, United States v. Stewart*, 590 F.3d 93 (2nd Cir. 2009). Second, 18 U.S.C. § 3553(a)(6) states that this factor or analysis is appropriate as well.

### 7. The need to provide restitution to any victim of the offense.

Ms. Womack. respectfully seeks a downward departure and/or variance based upon this sentencing factor in that she anticipates providing restitution in full on or before sentencing. Specifically, Ms. Womack anticipates satisfying the entire restitution payable to the Internal Revenue Service in the amount of $1.7 million. The Eighth Circuit has recognized that extraordinary restitution efforts may provide a basis for a downward departure. *See, e.g., United States v. Oligmueller,* 198 F.3d 669, 672 (8th Cir. 1999) ("We have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution."); *United States v. Garlich,* 951 F.2d 161, 163 (8th Cir. 1991). Ms. Womack has made an extraordinary effort in trying to gather the liquidity to provide full restitution. She has worked at a frenetic pace to obtain two loans from friends and to sell property, including farmland held in the family for some time. To suggest that Ms.

Womack could easily obtain close to two million dollars for restitution is simply erroneous. (*See* Gov't Sent. Memo. at p. 30).

Significantly, "in the absence of an agreement by the defendant, restitution may not be ordered for a Title 26 offense *except as a condition of probation or supervised release, under 18 U.S.C. 3583(d), 3563(b)(2), and 3556.*" *United States v. Westbrooks*, 858 F.3d 317, 329 (5th Cir. 2017) *quoting United States v. Nolen*, 523 F.3d 331, 332-33 (5th Cir. 2008) (emphasis added); *see also United States v. Feast*, 614 Fed.Appx. 195, 197 (5th Cir. 2015). As to restitution, Ms. Womack could simply have proceeded to sentencing and attempted to pay the amounts in accordance with a reasonable payment schedule that would have been fashioned by her supervisory probation officer, or this Court *after* any term of probation or supervised release began. Instead, Ms. Womack went to extraordinary lengths to meet this obligation in full. Such conduct is unique in cases of this magnitude.

The *Garlich*, *supra*, and *Oligmueller*, *supra*, cases give a firm foundation to support a departure or variance under such circumstances. Otherwise, there is no distinction between a defendant who makes such substantial and extraordinary efforts and those countless defendants who do not. The government cites *United States v. O'Malley* which is a pre-*Booker* case, *supra*, and did not involve any analysis of the variance factors set forth in 18 U. S. C. § 3553(a). The *O'Malley* case, argued by undersigned counsel before the Eighth Circuit, was remanded for resentencing (*See United States v.* O'Malley, 425 F.3d 492 (8th Cir. 2005)) at which time Mr. O'Malley was again granted a probationary sentence by the Hon. Richard Dorr. *See United States v. Doyon, et al.,* 3:01-cr-05022-RED,

Doc. No. 179. Importantly, even if the Court grants a variance from the otherwise applicable range of punishment, Ms. Womack will have a felony conviction. The goal of deterrence and punishment are still satisfied.

## V. CONCLUSION

Given the factual support for a downward departure pursuant to U.S.S.G. § 5K2.13, as well as all of the 18 U.S.C. § 3553(a) statutory sentencing factors discussed herein, the proposed sentence of a term of probation, or a sentence of time served, with a term of supervised release and any reasonable special condition that is deemed appropriate. Regardless of whether the applicable guidelines range falls within Zone D, the Court can order a sentence of probation. *United States v. Brewer*, 978 F. Supp. 2d 710, 713 (W.D. Tex. 2013) (sentence of probation warranted even though applicable guidelines range was 108 to 135 months' imprisonment); *United States v. Robins*, 2014 WL 11790802, at *1 (C.D. Cal. May 27, 2014) (defendant ordered to serve probation when guidelines range was 41-50 months' imprisonment). It should also be noted that the Court has the option to sentence Ms. Womack to time served and place her on supervised release. The U.S. Marshals took her into custody on the day of her self-surrender for her first appearance.

A non-custodial sentence will adequately reflect the seriousness of Ms. Womack's offense; promote respect for the law; and provide just punishment and achieve the mandate of 18 U.S.C. § 3553(a) to impose a sentence that is sufficient but not greater than necessary to serve the ends of justice.

Respectfully submitted,

WYRSCH HOBBS & MIRAKIAN, P.C.

By:    /s/ James R. Hobbs
        James R. Hobbs        MO #29732
        Marilyn B. Keller      MO #39179
        1200 Main, Suite 2110
        Kansas City, Missouri 64105
        jrhobbs@whmlaw.net
        mbkeller@whmlaw.net
        Tel:  (816) 221-0080
        Fax:  (816) 221-3280
        **ATTORNEYS FOR DEFENDANT**
        **V. CHERYL WOMACK**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 10th day of July, 2017, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

 s/ James R. Hobbs
*Attorney for Defendant*